UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EUGENE CARL De BOISE, SR. )<br>)<br>T.E.R., a minor child )<br>   by his next friend )<br>   Anneliese Hubbard, (his mother) )<br>)<br>A.N.D., a minor child )<br>   by her next friend )<br>   Sheena Marie Perry (her mother) )<br>)<br>      Plaintiffs, )<br>)<br>v. )<br>)<br>TASER INTERNATIONAL, INC. )<br>)<br>ST. LOUIS COUNTY, MISSOURI, )<br>)<br>POLICE OFFICER BRET LIVELY, )<br>     in his individual capacity, )<br>)<br>POLICE OFFICER JOSEPH PERCICH, )<br>     in his individual capacity, )<br>)<br>      Defendants. ) | Case No.:<br><br>**PLAINTIFFS DEMAND<br>TRIAL BY JURY** |

**COMPLAINT
WRONGFUL DEATH
CIVIL RIGHTS – PRODUCT LIABILITY**

Come now Plaintiffs, by counsel W. Bevis Schock, John Burton, Peter Williamson, Peter

T. Cathcart and John F. Baker,[1] and state for their civil rights and product liability wrongful death

case:

---

[1] Messrs. Burton, Williamson, Cathcart and Baker seek leave to appear pro hac vice.

1

**Introduction, Not Part of Complaint**

On an exceptionally hot evening in early July young Samuel De Boise came out of his house, naked, calling himself God, and obviously deluded.  He walked slowly toward gathered police officers.  He had frightened his mother.  He lay down on the ground, but then he rose up again.

The Police Officers pulled out TASER[2] electronic control devices (ECDs) and shocked Samuel over and over – for 52 seconds.  Samuel died.

Samuel's parents and children sue for wrongful death.  They include federal civil rights claims, a public entity liability claim, ADA claims for injunctive relief and damages, and state liability products claims.

**PRELIMINARY ALLEGATIONS**

**Parties**

1.      Plaintiff Eugene Carl De Boise, Sr., (Gene), is a married person residing in St. Louis County, Missouri.

2.      Gene is the father of Samuel De Boise, (Samuel), Plaintiff's decedent.

3.      Plaintiffs T.E.R., and A.N.D. are minor children residing in the City of St. Louis and St. Louis County, Missouri, respectively.

4.      Plaintiffs T.E.R., and A.N.D. are Samuel's only children.

5.      T.E.R.'s year of birth was 2003.  He is represented in this action by his mother, legally his next friend, Anneliese Hubbard.

---

[2] Plaintiffs capitalize "TASER" because the word is an acronym for "Thomas A. Swift Electronic Rifle".  "Thomas A. Swift" is the name of the lead character in a series of futuristic boyhood adventure stories.  NASA scientist John "Jack" H. Cover, the inventor of the TASER weapon, enjoyed the adventure stories when he was a child, and so named the gun after the lead character.

2

6.      A.N.D.'s year of birth was 2008.  She is represented in this action by her mother, legally her next friend, Sheena Marie Perry.

7.      Plaintiffs are all members of class (1) under the Missouri Wrongful Death Statute, RSMo. 537.080.

8.      Defendant Officer Bret Lively, DSN 3630, is a police officer employed by the St. Louis County Police Department.

9.      Defendant Officer Joseph Percich, DSN 3661, is a police officer employed by the St. Louis County Police Department.

10.     Plaintiffs sue Defendant officers in their individual capacities only.

11.     Defendant St. Louis County is a properly organized County in the State of Missouri.

12.     The St. Louis County Police Department is a subdivision of St. Louis County.

13.     Defendant TASER International, Inc., ("TASER") is a Delaware Corporation with its principal place of business in the State of Arizona.

14.     TASER does business in the State of Missouri.

**Samuel's Wife and Samuel's Mother**

15.     At the time of his death Samuel was married to Joan Mbau of Carrollton, Texas.

16.     Ms. Mbau is a member of Class (1) under the Missouri Wrongful Death Statute, RSMo. 537.080.

17.     As of the filing of this case Ms. Mbau has elected not to participate in the matter as a Plaintiff.

18.     Plaintiff's counsel will provide her notice pursuant to RSMo. 537.095.

19.     Samuel's mother is Betty Joe Gathing, (Betty).

20.     As of this filing Betty is not a Plaintiff in the case.

21.    Plaintiff's counsel will provide her notice pursuant to RSMo. 537.095.

## Jurisdiction

22.    Plaintiff brings this action, in part, pursuant to 42 U.S.C. §1983 and §1988 and the

Fourth and Fourteenth Amendments to the United States Constitution.

23.    The court has jurisdiction pursuant to 28 U.S.C. §1343(3) (civil rights), and 28 U.S.C.

§1331 (federal question).

24.    Plaintiffs pray the court to invoke its supplemental jurisdiction over Plaintiff's state law

claims pursuant to 28 U.S.C. §1367.

## Venue

25.    The events complained of occurred in the Eastern District of Missouri, in the Eastern

Division.

## Color of State Law

26.    At all relevant times the Defendant Police Officers were in uniform and acting within the

scope of their employment and under color of state law.  Particularly, at all relevant times

the Defendant Police Officers acted under color of the laws, statutes, ordinances,

regulations, policies, customs and usages of the State of Missouri, and its political

subdivisions.

27.    At all relevant times St. Louis County's responsible parties acted under color of state

law.

## Jury Demand

28.    Plaintiffs demand jury trial.

## FACTS

## Background

4

29.     In July 2008 Samuel, then age 29, resided with his parents, Gene and Betty, at the family home at 6136 Lake Paddock Dr., in unincorporated St. Louis County, MO 63033.

30.     Samuel had a bout of mental illness in his late teen-age years and was hospitalized for a few days.

31.     He lived for many years thereafter symptom free.

32.     Soon before this incident he developed renewed symptoms of mental illness.

33.     He was an amicable and loving young man, who was able to enter into meaningful relationships with other people.

34.     During his 20's he owned real estate and was a journeyman union painter.

35.     For several years he was employed by Sundermeyer Construction Company as a painter and taper.

36.     Later he worked in the construction field under the umbrella of his own company "A Plus Services."

37.     He did demolition work.

38.     He also operated a tow truck service.

39.     He was a rap artist, poet and musician. He performed with a group called "Truth Squad".

40.     Samuel was an affectionate father to his children, an affectionate son to his parents, and a devoted brother to his siblings.

**The Incident – Death of Samuel**

41.     Late in the afternoon of July 7, 2008, the day before his death, Samuel became delusional due to mental illness and left the house naked. He did not return that night.

42.     The next morning neighbors reported to police that a naked man was beating houses in the neighborhood with a stick and calling himself God.

43.     That evening, July 8, 2009, Samuel returned home and confronted his mother, Betty, on the second floor of the family home.

44.     When Samuel confronted his mother he was in a deranged rage.  He called himself God and demanded that his mother worship him.

45.     His condition frightened his mother.

46.     Samuel went downstairs and to the rear of the house.

47.     Betty furtively left the house through the front door and went to the neighbor's.

48.     Forthwith, at 8:49 p.m., Betty called 911 from a neighbor's phone, described Samuel's condition, and asked for the police to come.

49.     911 dispatch put out a call and described Samuel as an "OBS", which is police shorthand for "an observation case", or a mentally unstable subject.

50.     At the time of this incident Samuel needed medical and psychiatric attention.

51.     Police Officer Arthur Williams, DSN 2556, arrived at the scene.

52.     Betty ran to the street and told Officer Williams that her son's behavior was terrifying her.

53.     Betty also asked for an ambulance for her son.

54.     Officer Williams was therefore on notice that Samuel had not caused Betty serious injury.

55.     Officer Williams observed Samuel exit the house through the front door.

56.     Because it was still lingering daylight and there are street lights, Officer Williams could see that Samuel was naked.

57.     Officer Williams heard Samuel claim that he was God.

58.   Officer Williams then observed Samuel tear off the front screen door and reenter the home.

59.   Officer Percich, DSN 2105, arrived.

60.   Other officers responded soon thereafter.

61.   The officers used a bullhorn to direct Samuel to come out of the house.

62.   Samuel obeyed the officers. He slowly came out of the front door of the house and onto the porch.

63.   Samuel was still completely naked.

64.   Officer Maechling, DSN 3225 said:  "Sam, walk out to the grass and lay down on your stomach".

65.   Samuel walked from the porch to the grass with his hands in the air at shoulder height, palms out.

66.   Samuel lay on the grass on his stomach, in the prone position.

67.   Due to his nakedness and bizarre statements the officers were on notice that Samuel was delusional and that he would be unable to comprehend the officer's commands.

68.   Samuel began to raise himself back up from the ground, or, alternatively, stood all the way back up and then he glared.

69.   Samuel did not threaten the safety of the officers because:

   a.      He moved slowly,

   b.      There were many officers present,

   c.      He never assaulted the officers, and

   d.      He was obviously unarmed.

70.     When Samuel rose up Officer Percich shot Samuel in "barb mode" with his TASER
        Model X-26 ECD, Ser. No. X00-301300.

71.     Over the next 1 minute and 37 seconds Officer Percich shocked Samuel repeatedly.  His
        X-26 dataport shows six full five-second cycles and an additional two-second cycle.
        Officer Percich shocked Samuel for 32 total seconds.

72.     At approximately the same time or immediately thereafter Officer Lively shot Samuel in
        "barb mode" with his TASER Model X-26 ECD, Ser. No. X00-314910.

73.     Over the next 38 seconds Officer Lively shocked Samuel repeatedly. His X-26 dataport
        shows four full five-second cycles.  (There are two two-second cycles a few minutes
        later.  Those may have been "spark tests" and not delivered to Samuel).  Officer Lively
        shocked Samuel for at least 20 total seconds.

74.     Samuel endured shocking for at least 52 total seconds.

75.     Over the course of the shocking Samuel was in a deluded state, perhaps struggling
        somewhat.

76.     At the end of the shocking Samuel was on his stomach, in the prone position.

77.     At the conclusion of the shocking, or alternatively, during the shocking, one or more
        officers put their knees, bodies and or weight on Samuel's back.

78.     The weight on Samuel's back interfered with Samuel's ability to breath and recuperate
        from the shocks.

79.     At some point the officers handcuffed Samuel.

80.     Officers summoned ambulance personnel who were by then staging nearby.

81.     Ambulance personnel injected Samuel with Haldol and Ativan.

82.  The officers and the ambulance personnel then presumed there was nothing to be done and stood back for several minutes.

83.  At some point during that period, at first unbeknownst to the officers and medical personnel, Samuel entered full cardio-pulmonary arrest.

84.  On or about the time ambulance personnel attempted to transfer Samuel to a gurney they realized he was in full cardio-pulmonary arrest.

85.  Ambulance personnel initiated code protocol and attempted to revive Samuel.

86.  Ambulance personnel took Samuel to Christian Northeast Hospital, (CHNE).

87.  Medical personnel at CHNE continued code protocol and attempted to revive Samuel.

88.  All efforts to revive Samuel failed.

89.  At 10:03 CHNE's Dr. Anand pronounced Samuel dead.

**Facts Related to Defendant TASER International's Sale and Marketing of TASER ECDs**

90.  Defendant TASER manufactured the Model X-26 electrical control devices (ECDs) which the individual defendants used to shock Samuel.

91.  Defendant TASER marketed and sold the ECDs in Missouri and particularly to St. Louis County and its subdivision, the St. Louis County Police Department.

## DAMAGES

### Special Damages

92.  Samuel's family incurred funeral expenses in the amount of $4,625.00, plus the cost of a headstone, all in amounts in accordance with proof.

93.  Samuel's family incurred medical expenses in the amounts of $471.75 to CHNE, $1570.00, to North County Emergency Physicians, LLC, an additional $2609.32 to CHNE, and an ambulance bill, all in amounts in accordance with proof.

### Other Damages

94.  During the events described above, and before his death, Samuel endured excruciatingly painful, paralyzing electricity, humiliation, indignity, disgrace, stress, mortification and fear, all in amounts in accordance with proof.

95.  Samuel suffered death, and as he died, the knowledge that he was losing his life.

96.  Samuel suffered post-death loss of enjoyment of his life, all in amounts in accordance with proof.

97.  All other Plaintiffs suffered grief and emotional distress, all in amounts in accordance with proof.

98.  All other Plaintiffs lost Samuel's companionship, love and support, all in amounts in accordance with proof.

### CAUSATION

99.  The actions of Defendants and each of them proximately caused Samuel's death and the damages Samuel and Plaintiff suffered.

### CLAIMS FOR RELIEF

### COUNT I
### Excessive Force
### Federal Claim – 1983 – Fourth Amendment
### Against Individual Defendant Officers

100.  Plaintiffs incorporate all prior paragraphs.

101.  Defendant Officers deprived Samuel of the rights, privileges, and immunities secured by the Constitution and laws of the United States by subjecting him to excessive force under the Fourth Amendment.

102.  Particularly, Defendant Officers shocking of Samuel was unreasonable under the circumstances because Samuel was:

10

      a.      Obviously deluded,

      b.      Not resisting arrest, attempting to flee or threatening the safety of the officers, and

      c.      Naked and surrounded by police.

103.    Defendant Officers, because of their personal training, were aware that each application of a TASER shock to Samuel caused the infliction of great pain.

104.    Defendant Officers' use of force was also unreasonable under the circumstances because they:

      a.      Failed to simply hold Samuel down and handcuff him, particularly in light of the fact that he was naked and obviously delusional, and

      b.      Failed to stop shocking Samuel after a very low number of shocks.

      c.      In the alternative shocked Samuel after he was handcuffed.

105.    As a direct and proximate result of this use of excessive force, Samuel sustained serious personal injuries and death, and the Plaintiffs suffered the damages outlined herein.

**COUNT II**
**Deliberate Indifference to Serious Medical Needs**
**Federal Claim – 1983 – Fourteenth Amendment Substantive Due Process**
**Against Individual Defendant Officers**

106.    Plaintiffs incorporate all prior paragraphs.

107.    Defendant Officers deprived Samuel of the rights, privileges, and immunities secured by the Constitution and laws of the United States by acting with deliberate indifference to serious medical needs under Fourteenth Amendment substantive due process.

108.    As soon as the officers delivered the first shock Samuel was an arrestee.

109.    Particularly,

      a.      Defendant Officers treated Samuel as a criminal instead of as a deluded person. Instead of comprehending the obvious fact that Samuel could not understand and

11

follow directions, and instead of therefore initiating appropriate mental health treatment, such as by speaking calmly, or by going hands on and handcuffing Samuel through physical strength, Defendant Officers shocked Samuel for 52 seconds.  Under these circumstances the shocking constituted deliberate indifference to serious medical need for mental health treatment.

b.    Defendant Officers continued to shock Samuel for 52 seconds even though shocking for more than roughly 15 seconds can cause excessive catecholamine release, acidosis and death.  The officers' continued use of shocking after an initial 15 seconds constituted deliberate indifference to the serious medical needs created by the initial shocking.  The need to stop shocking Samuel was obvious even to a lay person. In the first moments after Defendant Officers had shocked Samuel for 52 total seconds he was hyperstimulated, acidotic and in great need of breath.  He therefore struggled for breath.  The officers kept Samuel on his stomach and put their body weight on his back.  The pressure of the officer's weight interfered with Samuel's recuperation and so contributed to Samuel's cardiac arrest and subsequent death.  The interference with Samuel's recuperation by breathing constituted deliberate indifference to Samuel's serious medical need for air.

110.   All three examples of deliberate indifference shock the conscience, even with the short time of deliberation involved in this situation.

111.   All three examples of deliberate indifference show subjective knowledge of the risk of harm and subjective intent to cause harm.

12

112.    As a direct and proximate result of these examples of deliberate indifference to Samuel's

serious medical needs, Samuel sustained serious personal injuries and death, and the

Plaintiffs suffered the damages outlined herein.

**COUNT III**
**Public Entity Liability**
**Federal Claim – 1983 – Monell**
**Against St. Louis County**

113.    On information and belief St. Louis County and its decision makers, with deliberate

indifference, gross negligence, and reckless disregard to the safety, security, and

constitutional and statutory rights of Samuel and the Plaintiffs, as well as others similarly

situated, maintained, enforced, tolerated, permitted, acquiesced in, and applied the

following policies, practices, or customs and usages:

a.      Failure to implement protocols and train deputies in the proper way to contain,

treat and secure irrational persons such as Samuel who presented no threat to the

officers at the time of engagement,

b.      Failure to adequately train, supervise, and control employees in the dangers of

repeated TASER ECD shocks,

c.      Failure to adequately train, supervise, and control employees in the necessity for

unimpaired breathing during the recovery period after shocking,

d.      Failure to promulgate, distribute and enforce reasonable ECD policies and

procedures such as which subsequent to this incident were recommended by the

Braidwood Inquiry in British Columbia, Canada, but which were apparent before

the Braidwood Inquiry.

114.  As a direct and proximate result of this conduct by St. Louis County, Samuel sustained

serious personal injuries and death, and the Plaintiffs suffered the damages outlined

herein.

**COUNT IV**
**Americans With Disabilities Act**
**Against St. Louis County**
**Damages and Injunctive Relief**

115.   Plaintiffs incorporate all prior paragraphs.

116.  Congress enacted the Americans with Disabilities Act upon finding, among other things,

that "society has tended to isolate and segregate individuals with disabilities" and that

such forms for discrimination continue to be "serious and pervasive social problem."  42

U.S.C. §12101(a)(2).

117.  In response to these findings, Congress explicitly stated that the purpose of the ADA is to

provide "a clear and comprehensive national mandate for the elimination of

discrimination against individuals with disabilities" and "clear, strong, consistent,

enforceable standards addressing discrimination against individuals with disabilities."  42

U.S.C. § 12101(b)(l)-(2).

118.  Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity. " 42 U.S.C. § 12132.

119.  The U.S. Department of Justice's regulations implementing Title II, particularly 28

C.F.R. § 35.160, require public entities to take appropriate steps to ensure that

communications with members of the public with disabilities are as effective as

communications with others.

14

120.   At all times relevant to this action, St. Louis County was a public entity within the meaning of Title II of the ADA, and provided to the general public law enforcement programs, services, and/or activities for which effective communication was an integral part.

121.   At all times relevant to this action, Samuel was a qualified individual with a disability within the meaning of Title II of the ADA and met the essential eligibility requirements for the receipt of the law enforcement services, programs, and/or activities of St. Louis County Police Department.

122.   Through its acts and omissions described herein, Defendant St. Louis County has violated Title II of the ADA by excluding Samuel by reason of his disability from participation in and/or by denying him the benefits of the law enforcement services, programs, and/or activities the St. Louis County Police Department provides to the general public.

123.   Through the acts and omissions of its agents and employees St. Louis County subjected Samuel to discrimination on the basis of his disability in violations of Title II of the ADA by failing to provide him with communication that was as effective as communication provided to the general public in the following law enforcement situations:

   a.      Control, and

   b.      Arrest.

124.   On information and belief agents and employees of St. Louis County committed the acts and omissions alleged herein intentionally and/or reckless disregard of Samuel's rights.

125.   As a direct and proximate result of these acts, Samuel sustained serious personal injuries and death, and the Plaintiffs suffered the damages outlined herein.

126.   On information and belief the agents and employees of St. Louis County have failed and

continue to fail to:

a.      Train and supervise agents and employees of St. Louis County to recognize and

identify mentally ill persons,

b.      Train and supervise agents and employees of St. Louis County to effectively

communicate and interact with mentally ill persons, and

c.      Adopt, implement, and enforce adequate policies and procedures to provide

effective communication and interaction with mentally ill persons.

127.    Because the discriminatory conduct of agents and employees of St. Louis County is

ongoing, declaratory and injunctive relief are appropriate remedies.

128.    Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to injunctive relief and to recover

damages and reasonable attorneys' fees and costs incurred in bringing this action.

**COUNT V**
**Products Liability – Strict Liability – Defective Product**
**State Law Claim**
**Against Defendant TASER**

129.    Plaintiffs incorporate all prior paragraphs.

130.    In the ordinary course of its business Defendant TASER designed, manufactured, sold,

distributed, installed, fabricated, assembled, bought, inspected, tested, serviced,

marketed, warranted, and advertised the subject TASER ECD ordnance to the St. Louis

County Police Department.

131.    The TASER ECD ordnance contained design and/or manufacturing defects when put to a

reasonably anticipated use, particularly in that when officers would fire their TASERS at

a subject in connection with an arrest, and then follow up by shocking the subject

multiple times, the subject could die.

132.    The product was and is unreasonably dangerous and defective for use on human beings

16

because, among other reasons, it fails to meet consumer expectations because it can trigger cardiac arrest with direct electrical shocks to the chest, stimulate catecholamine release, and cause or aggravate metabolic acidosis.

133.   In this case the officers used the TASER ECD ordnance in a reasonably anticipated use, particularly, in that they used the TASERS in the course of arresting Samuel and shocked him multiple times.

134.   As a direct and proximate result of the above-described defects in the TASER ECD ordinance, Samuel sustained serious personal injuries and death, and the Plaintiffs suffered the damages outlined herein.

**COUNT VI**
**Products Liability – Strict Liability – Failure to Warn**
**State Law Claim**
**Against Defendant TASER**

135.   Plaintiffs incorporate all prior paragraphs.

136.   Because of formal experimentation and because of actual incidents around the world Defendant TASER:

a.      Knew that the design, manufacture, assembly, marketing and distribution of the Model X-26 was defective and dangerous,

b.      Knew that because of the defects the weapon could not be used safely for the purpose for which it was intended, and

c.      Knew that the individual defendants, and each of them, would use the product as it was used here.

137.   With that knowledge, in conscious disregard of the safety of the public, Defendant TASER placed this product on the market without warning customers or the unknowing public of the defects and dangers.

17

138. Defendant TASER sold the TASER ordnance to the Saint Louis County Police Department without warnings as to the effect of darts to the front of the upper chest, repeated cycles with multiple devices, and the effects of such repeated cycles with multiple devices, which include cardiac arrest and death.

139. Defendant TASER knew when it did so that this weapon would be sold and used without knowledge of the defects and dangers.

140. Defendant TASER, by placing the defective and dangerous weapon on the market, expressly and impliedly represented that it was safe for the purpose for which it was intended.

141. Defendant TASER sold ordnance to local law enforcement agencies including St. Louis County without adequate warning of or training in its potential for causing death and great bodily injury, especially when shocks are administered to the front chest repeatedly, or when repeated shocks are followed by aggressive restraint procedures that impair breathing.

142. The other defendants herein, in purchasing and using the defective weapon as herein alleged, relied on each of Defendant TASER's representations and misrepresentations.

143. As a direct and proximate result of the above-described defects in the TASER Ordinance, and the failure to warn, Samuel sustained serious personal injuries and death, and the Plaintiffs suffered the damages outlined herein.

**COUNT VII**
**Products Liability – Negligence – Defective Product**
**State Law Claim**
**Against Defendant TASER**

144.  Plaintiffs incorporate all prior paragraphs.

145. Defendant TASER failed to use ordinary care to manufacture or design the product to be

reasonably safe.

146.    As a direct and proximate result of the above-described defects in the TASER ordinance, Samuel sustained serious personal injuries and death, and the Plaintiffs suffered the damages outlined herein.

## COUNT VIII
### Products Liability – Negligence – Failure to Warn
### State Law Claim
### Against Defendant TASER

147.    Plaintiffs incorporate all prior paragraphs.

148.    Defendant TASER had no reason to believe that the user would realize the danger posed by the product's defect or hazard.

149.    Defendant TASER knew or by using ordinary care should have known of the dangerous condition of the product.

150.    As a direct and proximate result of the above-described defects in the TASER Ordinance, Samuel sustained serious personal injuries and death, and the Plaintiffs suffered the damages outlined herein.

## COUNT IX
### Products Liability – Intentional Concealment and Fraud
### State Law Claim
### Against Defendant TASER

151.    Plaintiffs incorporate all prior paragraphs.

152.    Plaintiffs are informed and believe that the individual defendants were trained in the use of the TASER Model X26 ECD by compact disc media, oral and written instruction, training, warnings, and other methods provided directly or indirectly to the defendant officers and St. Louis County Police Department by Defendant TASER.

153.    Plaintiffs are informed and believe that prior to the date of this incident, July 8, 2008,

Defendant TASER, misrepresented, failed to disclose and/or failed to warn the St. Louis County Police Department and the officers on the scene of the following material facts, among others:

a.       Falsely represented that its ECDs cannot cause cardiac arrest directly; (See, e.g., Version 12, 13 and 14 TASER Training Materials).

b.       Falsely represented that its 26-watt ECDs cannot cause cardiac arrest indirectly through catecholamine release and acidosis; (See, e.g., Version 12, 13 and 14 TASER Training Materials).

c.       Falsely represented that "after initially deploying the TASER X26 upon the suspect a law enforcement officer should be prepared to deliver additional cycles." (See, e.g., Version 13 TASER X26 Certification Test).

d.       Falsely represented that multiple ECD discharges into a human being presents no greater health risk than a single discharge.

e.       Falsely represented that a TASER 26-watt ECD affects the sensory and motor nervous systems, but cannot affect the cardiac system of a suspect (See, e.g., Version 13 TASER X26 Certification Test).

f.       Failed to disclose and/or warn that a TASER ECD is a potentially lethal device which can cause cardiac arrest and death.

g.       Failed to disclose and/or warn that the risk of death to someone in an agitated and delusional state because of mental illness is greatly increased by repeated ECD shocks, especially when followed by aggressive police restraints that impair or compromise breathing, and that law enforcement including the officers of the St. Louis County Police Department should endeavor to deploy the ECD shocks as

20

briefly as possible and then not use any restraint which might impair breathing to minimize or eliminate the risk of cardiac arrest, brain damage and/or death.

h.      Failed to disclose and/or warn that multiple cycles and uses of EDCs on a single person increased the risk of cardiac arrest and death.

154.   Defendant TASER intentionally represented to the St. Louis County Police Department and the police officer Defendants of the material statements set for herein above, including those set forth in the preceding paragraph, and many more of a similar nature.

155.   These representations were in fact false.

156.   Defendant TASER knew that the misrepresentations were false when it made them, and/or made the representations recklessly and without regard for their truth, or negligently.

157.   Defendant TASER intended that law enforcement agencies such as the St. Louis County Police Department when purchasing its products, and that individual officers such as the defendant officers would rely on the misrepresentations when using its products.

158.   The St. Louis County Police Department did, in fact, did rely on these misrepresentations in purchasing, deploying, training, instructing, and otherwise using TASER manufactured ECDs as a law enforcement tool in interacting with members of the public such as Samuel.

159.   Defendant TASER intentionally failed to disclose to the St. Louis County Police Department and other law enforcement agencies and to the defendant officers and other law enforcement officers material and important facts that were known only to Defendant TASER and could not have been discovered by law enforcement agencies, all as described hereinabove.  These important and material facts include, but are not limited to:

that its ECDs can be in fact "lethal", that its ECDs can and do on occasion cause or aggravate acidosis, cardiac arrest, and death, and that the risk of cardiac arrest is significantly decreased if electrical discharges from the ECD are minimized.

160.   Defendant TASER actively concealed these important material facts from law enforcement agencies, and/or prevented such agencies from discovering these facts. Instead, Defendant TASER disclosed partial truths about its ECDs but intentionally and negligently failed to disclose the important and material facts set forth above.

161.   At all times herein mentioned, the St. Louis County Police Department and the defendant individual officers were reliant upon Defendant TASER for appropriate warnings, instructions, and for the necessary medical and scientific evidence so that officers of St. Louis County Police Department could be properly trained and instructed in the use of the ECDs.

162.   The St. Louis County Police Department, its officers, and other law enforcement agencies and their officers did not know of the facts concealed by Defendant TASER.

163.   Defendant TASER intended to deceive the St. Louis County Police Department, other law enforcement agencies, and the general public, of the true facts in order to promote and sell its ECDs with artificial and inflated safety claims, and to make profits.

164.   The St. Louis County Police Department and other law enforcement agencies reasonably relied on Defendant TASER's deceptions.

165.   As a legal result of Defendant TASER's misrepresentations and concealment, Samuel and the Plaintiffs suffered economic and non-economic damages, including the damages outlined herein.

_____

22

**PUNITIVE DAMAGES –**
**APPLICABLE TO ALL COUNTS, FEDERAL AND STATE**
**EXCEPT COUNTS AGAINST GOVERNMENT ENTITY**

166.    The conduct of the defendant officers and of TASER was malicious or recklessly indifferent to the rights of Plaintiffs and Samuel.

167.    The Officers shocked Samuel multiple times because Samuel was naked and they did not want to touch him, even though Samuel presented no threat to them.

168.    Defendant TASER failed to warn St. Louis County or the Officers of the product defects because they did not want to inhibit sales of the product, and thereby reduce the profitability of their business enterprise.

169.    On information and belief Defendant TASER acted in a despicable, malicious and oppressive manner, in conscious disregard of, and with reckless indifference to the rights of Samuel and other people whom they knew, or reasonably should have known, were likely to be shocked with TASER ordnance by law enforcement officers not adequately warned or trained about the extreme and unreasonable danger of this product, and that the weapons posed an unreasonable risk of serious bodily injury or death to people such as Samuel.

170.    Defendant TASER engaged in such conduct before this incident, and has engaged in the conduct since this incident.

171.    Plaintiffs are entitled to an award of punitive damages against Defendant Officers and against TASER in order to punish them and to deter others.

## ATTORNEY'S FEES –
## APPLICABLE TO 1983 and ADA CLAIMS

172.    Under 42 U.S.C. §1988 if Plaintiffs are the prevailing parties in their federal claims under 42 U.S.C. 1983, then they will be entitled to receive from Defendants reasonable attorney's fees, non-taxable expenses, and costs.

173.    Under 42 U.SC. § 12205 if Plaintiffs are the prevailing parties in their ADA claims under 42 U.S.C. § 12132, then they will be entitled to receive from Defendants reasonable attorney's fees, non-taxable expenses, and costs.

## APPORTIONMENT OF DAMAGES

174.    Under the Missouri wrongful death statute, if and when the Plaintiffs receive compensation for their damages, the court must apportion the funds among the Plaintiffs.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants, for compensatory and punitive damages (but no punitive damages against St. Louis County), attorney's fees, costs, non-taxable expenses.

Plaintiffs also pray the court to apportion all funds received among the four Plaintiffs.

Plaintiffs also pray for such other relief as the court finds to be just, meet and reasonable.

24

Respectfully Submitted,

Attorneys for Plaintiffs

   /s/ W. Bevis Schock   .
W. Bevis Schock, MBE# 32551, FedARN# 15278
7777 Bonhomme Ave., Ste. 1300
St. Louis, MO  63105
wbschock@schocklaw.com
Fax:   314-721-1698
Voice: 314-726-2322


   /s/ John Burton   .
John Burton, California State Bar No. 86029
THE LAW OFFICES OF JOHN BURTON
414 South Marengo Avenue
Pasadena, California  91101
Telephone:   (626) 449-8300
Facsimile:   (626) 449-4417
jb@johnburtonlaw.com


   /s/ Peter Williamson   .
Peter M. Williamson, California State Bar No. 97309
WILLIAMSON & KRAUSS
21800 Oxnard Street, Suite 305
Woodland Hills, CA  91367
Telephone:   (818) 226-5700
Facsimile:   (818) 226-5704
pmw@williamson-krauss.com


   /s/ Peter T. Cathcart   .
Peter T. Cathcart, California State Bar No. 93611
Magana, Cathcart & McCarthy
1801 Avenue of the Stars, Suite 600
Los Angeles, California  90067-5801
Telephone:   (310) 553-6630
Facsimile:   (310) 407-2295
Peter.cathcart@verizon.net


   /s/ John F. Baker   .
John F. Baker, California State Bar No. 260365
Magana, Cathcart & McCarthy
1801 Avenue of the Stars, Suite 600
Los Angeles, California  90067-5801
Telephone:   (310) 553-6630
Facsimile:   (310) 407-2295
bakerjf@aol.com